UNITED STATES DISTRICT COURT
OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  1:25-cr-10181 |
| | ) | |
| JAMES WELCH | ) | |

<u>SENTENCING MEMORANDUM</u>

At 30 years of age, James is now stepping into a new decade of his life and is determined to make changes. His youth, teenage years, and twenties were spent struggling with serious depression, anxiety, and substance use. Looking back, he understands how the turmoil created from these battles has had a lasting and destructive impact on the trajectory of both his life and his family's life, and he understands that the time to chart a new path forward is now.

Taking a long, honest look at one's life, mistakes, and flawed choices is not an easy task. Neither is examining the ways those choices ripple outward and create further harm. But James, recognizing that he wants and deserves a fundamental course correction for his life, has been doing just that. While incarcerated he has engaged in voluntary programming and mental health work, and is proud to say he has now been sober for seven months. James has also embarked, in earnest, on the difficult path of self-examination, as he works to recognize the role his mental health and substance use issues and his resultant flawed, short-term thinking have played in his life and offending behavior. While at Wyatt, he applied for, was accepted into, and participated in a Restorative Justice workshop and has developed genuine accountability for his past choices. With this work he has gained a depth of insight and maturity and is taking affirmative steps in the right direction to do something different.

James is committed to changing for the better. He submits this memorandum to assist the Court in sentencing him for his offense, one count being a felon possession of a firearm, in violation of 18 U.S.C. § 922(g)(l), a crime he has pled guilty to and takes full responsibility for. For the reasons set forth below, James asks this Court to impose a sentence of 27 months of imprisonment, followed by thirty-six months of supervised release and specifically tailored conditions of federal supervision that includes meaningful and in-depth substance use and mental health treatment. Such a sentence is "sufficient, but not greater than necessary" given the nature of the offense before the Court, Mr. Welch's personal history, and other reasons properly considered under 18 U.S.C. §3553(a).

I. **James Welch's History and Background and the Nature and Circumstances of the Offense.**

The PSR carefully lays out the struggles and adversity Mr. Welch has faced and the ways poverty and family instability shaped his young life. From ages six to nine, Mr. Welch lived in a shelter with his mother and younger brother. *PSR at ¶ 83*. Although his mother was loving and caring to her children, doing the best she could as (essentially) a single mother, her own mental health and emotional struggles prevented her from caring for her children. By age eight, with his mother unable to care for him, Mr. Welch was placed in Department of Children and Family (DCF) residential care, cycling through foster home and DCF placement after placement, until he aged out of DCF custody after age 18.

During this time, his most formative years was further marred with exposure to violence, *PSR at ¶ 83,* as well as his own struggles with mental illness. *PSR at ¶¶ 83-84.* Often overwhelmed by the emotional trauma of being separated from his mother and the stress and instability of being placed in the DCF system, Mr. Welch's experiences of anxiety and depression worsened as he grew older. By his teenage years, he had discovered that drugs and alcohol

worked to numb his increasing emotional and mental health struggles. *PSR at ¶¶ 88-89.* Unfortunately, his self-medication with alcohol and substances only further exacerbated his own battles with his mental health, trapping him in a downward spiral where the more drugs and alcohol he used, the more he need to cope with his intensified mental and physical distress. It was, unsurprisingly, during this time, throughout his late teens and early twenties, that James found himself in and out of the criminal justice system, sustaining convictions in state district court for offenses that were the direct result of his unchecked and untreated substance use disorder and his pervasive mental health struggles.

Despite these difficulties – James has continued to strive towards self-improvement. Having never been charged or prosecuted federally, James views his prosecution in the instant matter as a serious "wake-up call", *PSR at ¶ 89*, and articulates his understanding of the role his untreated mental illness and his substance use disorder have played, both in the instant matter and his past criminal history. *PSR at ¶ 84.*

After his arrest on the instant matter on February 28, 2025, James was so ill from acute opioid withdrawal that he had to be taken to the hospital and could not attend the originally scheduled initial appearance (originally scheduled for the same day), ultimately making his initial appearance on March 3, 2025. *PSR at ¶ 1.* Driven by his desire to take responsibility for his offense, James promptly waived indictment and entered his guilty plea three months later, on June 10, 2025. *PSR at ¶ 2.*

Having never before received any treatment for what has been, at this point, at long and pervasive poly-substance use disorder, James is committed to engaging in meaningful and long-term treatment to maintain his sobriety. *See PSR at ¶¶ 89, 90-91.* Since his arrest in February, he has now over seven months of sobriety and recognizes that his increasingly destructive substance

use leading up to the instant offense was spurred by the loss of his mother and grandmother in 2024, and his attempts, in his own words, to "help numb [my] feelings of pain and grief". *PSR at ¶ 89*. Because James understands the pivotal role his sobriety will play in his ability to live a successful life, he is eager to begin treatment as soon as possible, and requests a placement to a Bureau of Prisons facility where he can engage in the Residential Drug Abuse Program (RDAP). *PSR at ¶ 91*.

James further understands that his sobriety is intricately linked to his mental health and is committed to engaging with mental health counseling and treatment. *PSR at ¶ 86*. During the last seven months of his incarceration, he has taken psychoeducational and mindfulness classes and activities, completed self-help courses, and is eager to continue his mental health work, including finding a therapist and engaging in long-term therapeutic relationship with a counselor, once he has completed his term of incarceration and has returned to the community. *See id*.

While at Wyatt, he has also worked in the kitchen, remained free of any disciplinary issues, and completed numerous certificate programs, including Living with Others and Rational Thinking, while also completing the Restorative Justice Workshop. *PSR at ¶¶ 5, 93*. His participation in the restorative justice program was profoundly impactful, and has further driven home his commitment to long term mental health and substance use treatment. As an engaged member of that program, he developed a better sense of self and understanding of the damage he brought to his community and family, the ways his mental health and substance use were catalysts for his harmful choices, and importantly, the good he can do going forward.

Ultimately, James' drive to continue his sobriety, stabilize his mental health, and begin a new chapter of his life is motivated by the two most important people in his life– his partner Kerry and their daughter Jaelynn. James acknowledges that his relationship with Kerry has

indeed been tumultuous in the past – and he sees the way his own mental health and substance use have been signficant drivers of those difficulties. However, in the past few years before his arrest in this matter, even in the midst of his own continued struggles, he and Kerry's relationship has significantly improved.[1] At present, James and Kerry communicate daily and are jointly focused on the ways that they can best parent their daughter and give her the life she deserves. To that end, the most powerful motivator of James' commitment to a new life is his daughter Jaelynn. He asks for a judicial recommendation for a placement at FCI-Danbury, or other BOP Facility (commiserate with his security level and which provides the RDAP Program) that is as close to Massachusetts as possible, so that his family may visit him during his period of incarceration.

James' commitment to a new life includes tangible goals for the future. Upon release from custody, he plans to return to home to his family and daughter and looks forward to the day he can again be the parent that drops her off at school, picks her up when her day is done, drives her to her extracurricular activities, and coaches her sports teams. *See PSR at* ⁋ 69. He plans to participate in any job trainings programs available to him while incarcerated and hopes to enroll in the CARE program while on supervised release, so that he can utilize the support and resources that program offers to succeed in his goals for long-time sobriety, stable mental health, and a successful career that will enable him to provide for his daughter and family.

    II.    **Mr. Welch's Criminal History in Context**

> *"[T]he rental car companies have it right." The brain isn't fully mature at 16, when we are allowed to drive, or at 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."*

---

[1] As federal probation articulates on p. 41 of the PSR, James has had no domestic violence charges that resulted in a conviction in the last six years (since 2019), nor does he and Kerry have any active retraining orders between (and have not for years). *See PSR*, p. 41.

- *Massachusetts Institute of Technology – Young Adult Development Project*[2]

Mr. Welch has a total of 20 criminal history points that place him in criminal history category VI. *PSR at ¶¶ 36-48*. Counsel submits that, although properly calculated, this calculation overemphasizes Mr. Welch's prior criminal history and future recidivism risk.

To begin, the entirety of Mr. Welch's criminal history is driven by offenses that occurred when he was 24 years of age or younger. Ten of these points derive from offenses committed while Mr. Welch was 21 or younger. *PSR at ¶¶ 36-43*. Thus, half of his criminal history points are garnered from offenses he committed as an adolescent[3] and all of his criminal history is derived during at time period where his brain was still developing and was not fully mature.[4]

The sentencing guidelines authorize downward departures where the criminal history classification "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. §4A1.3. In *United States v. Lindia*, 82 F.3d 1154, 1165 (1st Cir. 1996), the court held that a sentencing court may depart downward if it determines that the category inaccurately reflects defendant's actual criminal history. As the offenses that Mr. Welch committed as a teenager and late-stage adolescent are inherently the product of immaturity and a still-developing brain, counsel submits that the Court should vary down to criminal history category IV when considering what constitutes an appropriate sentence.

---

[2] Available at: https://hr.mit.edu/static/worklife/youngadult/brain.html
[3] *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorney, and Policy Makers, p.2*. Center for Law, Brain & Behavior at Massachusetts General Hospital. December 2021. Available at: https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/
[4] "The rational part of a teen's brain isn't fully developed and won't be until age 25 or so." University of Rochester Medical Center. *Understanding the Teen Brain*. Available at: https://www.urmc.rochester.edu/encyclopedia/content?ContentID=3051&ContentTypeID=1

Mr. Welch's age is a pertinent factor for the Court to consider when determining the appropriate sentence to impose. In *United States v. Gall*, 128 S.Ct. 586, 601 (2007), the District Court was struck by the fact that all of Gall's criminal history occurred when he was 21 years old or younger. In *Gall,* the District Court Judge cited *Roper v. Simmons,* 543 U.S. 551, 569 (2005), "which quot[ed] a study stating that a lack of maturity and underdeveloped sense of responsibility are qualities that 'often result in impetuous and ill-considered actions.'" The judge recognized the relevance of these studies. Immaturity at the time of the offense conduct is not an inconsequential consideration. Studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five...[T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant. *Id. at 601*.

The Supreme Court has held that it was "not unreasonable for the District Judge to view immaturity at the time of the offense as a mitigating factor...." *Id*. at 601. *See also Miller v. Alabama*, 132 S.Ct. 2455 (2012) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher order executive functions. During puberty juveniles experience a rapid increase in reward and sensation seeking behavior that declines progressively throughout late adolescence and young adulthood. This effect is amplified by exposure to peers, and it corresponds with significant changes in certain elements of the brain's incentive processing system – especially the parts that process rewards and social cues"). Significantly, the Sentencing Commission, following the Supreme Court's lead, amended 5H1.1 (Age Policy Statement). The amendment moved consideration of age from a "not ordinarily relevant" factor to a factor that "may be relevant in determining whether a departure is

warranted...." November 1, 2010 Amendments to the Sentencing Guidelines. The Sentencing Commission reached the decision to amend 5H1.1 "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." *Id.* Thus, age is a factor this Court can, and should, consider in reaching its decision about what sentence to impose.

James was within the stages of adolescence during the time frame of the offenses which earn him half of his criminal history points. And Scientific research on brain development shows that "the brain does not begin to resemble that of an adult until the early 20s." National Institute of Mental Health, *The Teen Brain: Still Under Construction* (2011).[5] In *Johnson v. Texas,* 113 S.Ct. 2658, 2669 (1993) the Supreme Court stated that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage", quoting *Eddings v. Oklahoma,* 102 S.Ct. 869 (1982).

Here, Mr. Welch's guideline range is impacted, as detailed above, by convictions that occurred when he was still an adolescent and young man with a developing brain. As such, counsel submits that Criminal History Category IV[6] paints a more accurate picture of his overall prior conduct and more aptly represents his current and future risk of recidivism, now, as a man in his thirties.

### III.    A Just Sentence

---

[5]     Available at http://www.nimh.nih.gov/health/publications/the-teen-brain-still-under-construction/index.shtml).

[6]     With a total offense level of 13 and a criminal history category of IV, the corresponding sentencing guideline range is 24-30 months. Under the JSIN data, defendants whose primary guideline was §2K2.1, with a Final Offense Level of 13 and a Criminal History Category of IV received an average sentence of 25 months. *See Judiciary Sentencing Information (JSIN)*, available at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard

Given the positive prognostic signs and growth shown by Mr. Welch just over the last seven months, as well as the nature of his offense at issue, the requested sentence will be sufficient but not greater than necessary to effectuate the sentencing goals of 18 U.S.C. § 3553(a).

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *See United States v. Yonathan Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. United States,* 562 U.S. 85, 101 (2007). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

Pursuant to 18 U.S.C. §3553(a)(2), the Court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Put simply, these four purposes of sentencing are punishment,

deterrence, incapacitation, and rehabilitation. In Mr. Welch's case, the requested sentence achieves those goals.

The requested sentence, followed by an additional thirty-six months of supervised release is an impactful one that adequately reflects the seriousness of the offenses before the Court and provides just punishment. Such a sentence imposes a meaningful period of incarceration, and places him on federal supervised release for at least three years – resulting in the longest period of incarceration *and* the longest period of community supervision - with the most stringent conditions of release - that James has ever been subjected to. This term of supervised release, in addition to its purposes of rehabilitation and protection of the public, constitutes additional punishment. Lastly, the requested sentence promotes respect for the law pursuant to §3553(a)(2)(A) because "the unique facts of [Mr. Welch's] situation" support the conclusion that "a sentence of [excessive] imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall,* 552 U.S. at 54 (citations omitted).

For Mr. Welch, the key to deterring future criminal conduct will be achieved by in-depth substance use and mental health treatment. Such treatment will ensure he continues to address the root causes of his offending, deterring risk of future criminal thinking and behavior, while simultaneously supporting him as he continues to change –decisively and completely- for the better. Further, the requested sentence will allow him to return to the community to begin in-depth treatment crucial to his recovery without delay, and will provide him with a significant 3-year term of supervised release that will give him the support crucial to his success. A greater sentence will unnecessarily delay these goals.

Scientific research on the relationship between mental health treatment and recidivism suggests that mental health treatment significantly reduces the likelihood of recidivism. Jeffrey Abracen, et al., *Individual Community-Based Treatment of Offenders with Mental Illness-Relationship to Recidivism*, Journal of Interpersonal Violence, Vol. 31:10 (2015)6; *See also* Zgoba, Reeves, Tamburello, & Debilio, *Criminal Recidivism in Inmates with Mental Illness and Substance Use Disorders*, American Academy of Psychiatry and the Law 48:2 (2020)7(summarizing research to date that better engagement in treatment for persons with mental illness on re-entry reduces the risk of committing a serious crime). Similarly, substance use treatment produces a meaningful reduction in recidivism risk. Indeed, Courts have recognized, in the context of substance abuse, the impact successful treatment programs can have on significantly reducing the likelihood of recidivism. *See United States. v. Perella*, 273 F.Supp.2d 162, 164 (D. Mass. 2003) (observing that if drug addiction creates a propensity to crime, drug rehabilitation goes a long way to preventing recidivism). Statistics suggest the recidivism rate is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of the prison setting, citing Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders,* 53 Hastings L.J. 1217, 1220 (2002)).

Of course, James is exceedingly conscious that if he fails to maintain and attend to his sobriety and mental health needs, he will likely spend a significant portion of his life in and out of jail. That is certainly true for the years he will be on supervised release. Mr. Welch's course correction since his arrest in this matter reflects this understanding, as well as the fact that he has worked, on his own, to begin the process of examining his treatment needs and the causes of his offending. These positive steps are reflective of his desire, and his ability, to change – decisively for the better.

Further, the recommended sentence would have an "adequate" deterrent effect on both the general public and Mr. Welch. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because over a decade's worth of research indicates that while certainty of being caught and punished produces a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[7]

In sum, empirical studies have shown that longer sentences have minimal or no benefit on whether potential offenders commit crimes. The National Academy of Sciences (NAS) concluded that there is insufficient evidence justifying policy choices on the assumption that harsher punishments yield measurable deterrent effects, and that all leading surveys of the deterrence research reach the same conclusion: that 'potential offenders may not accurately perceive, and may vastly underestimate, those risks and punishments' associated with committing a crime.[8]

As James' strongest deterrence from criminal conduct will be achieved by an in-depth treatment for his substance use and mental health needs, rehabilitation should be a primary sentencing goal. Treatment will ensure he continue to address the root causes of

---

[7]   Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)(available at: http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf ); *see also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

[8]   Brennan Center for Justice, What Caused the Crime Decline? (26 Feb. 2015), available at: https://www.brennancenter.org/publication/what-caused-crime-decline

his offending, deterring risk of future criminal thinking and behavior, while simultaneously supporting him as he continues to change for the better. Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). The requested sentence will allow him to return to the community where he can engage in in-depth treatment, and will provide him with a significant 3-year term of supervised release that will give him the support that is crucial to his success.

Although a period of incarceration longer than the requested sentence would certainly exist to incapacitate him further, the costs cannot be justified. Instead, additional carceral time would prolong his separation from his family and daughter, diminish his potential earning capacity, isolate him from developing pro-social connections in the community, delay his productive contribution to society, postpone his timely access to critical substance use and mental health treatment, and risk exacerbating his mental health conditions. It would all but halt his rehabilitation, offer no additional deterrent value, stymie meaningful retribution, and subvert the additional sentencing goals of 18 U.S.C. § 3553(a)(2).

## CONCLUSION

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Where society's interest in and need for retribution, deterrence, and protection are concerned, offenders with both substance use and mental health concerns, like James, represent a special case. The late

Chief Justice Gants of the Massachusetts Supreme Judicial Court pressed that a "sentence should be crafted to best enable the defendant […] to 'get past the past,' that is, to address the problems that brought the defendant to the courtroom in order to diminish the risk that [s]he […] will commit additional crimes."[9] The requested sentence is crafted specifically to enable both Mr. Welch to finally get "past the past," and to address the very issues which caused to him to offend in the first place. The requested sentence, with specific recommendations for treatment during his term of supervised release, serves and fulfills the sentencing goals of rehabilitation, public safety, and deterrence.

Respectfully submitted,

Mr. James Welch
By his attorney,

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
BBO#674760
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

Certificate of Service

I, Forest O'Neill-Greenberg, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those

---

[9] Remarks by Chief Justice Ralph Gants, Supreme Judicial Court, Univ. of Mass. – Boston, Mar. 16, 2015.